IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 24, 2018 Session

**GREGORY DUFF v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 107757    Steven Wayne Sword, Judge**

_____

**No. E2017-01757-CCA-R3-PC**

_____

The petitioner, Gregory Duff, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Robert L. Jolley, Jr. and Megan A. Swain, Knoxville, Tennessee, for the appellant, Gregory Allen Duff.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Charme Allen, District Attorney General; and Phillip Morton and TaKisha Fitzgerald, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

**Facts and Procedural History**

In 2012, a Knox County jury convicted the petitioner of two counts of aggravated kidnapping, Class B felonies.  The counts merged and the petitioner is currently serving a nineteen-year sentence in the Tennessee Department of Correction.  On direct appeal, the petitioner challenged the sufficiency of the evidence supporting his conviction and the trial court's admission into evidence of several 911 calls.  In denying his challenge, this

Court affirmed the petitioner's conviction and, in doing so, provided the following summary of facts:

### State's Proof

Michael Allen Mays testified as the keeper of the records for the Knox County 911 Office. He authenticated a disk of audio recordings of four emergency calls made in this case on July 13, 2010. Based on the computer aided dispatch, or CAD report, Mr. Mays said that the initial 911 call was received at 1:15 a.m., the police were dispatched at 1:20, and the first officer arrived at the scene at 1:32 a.m.

The recordings of the 911 calls were played for the jury. In the first call at 1:15 a.m., Whitney Karnes reported that "someone just got kidnapped at Cassell Ridge Apartments."[1] She told the dispatcher that a black male was beating a black female and then he placed her in a white truck and drove out of the apartment complex. She reported that the victim attempted to get out of the truck, but the suspect "was holding her in" and "wouldn't let her out." The caller stated, "Somebody needs to hurry before she ends up killed." The phone call lasted a little over three minutes.

In the second 911 recording, which was also placed at 1:15 a.m., a woman named Teresa Wyatt reported that she lived at Cassell Ridge Apartments and that a girl was kidnapped right out of the parking lot. She told the dispatcher that the suspect was "dragging [the victim] down the parking lot in the passenger side" and that they left in a white pickup truck that had its lights off. The caller reported that her son was pursuing the vehicle on foot and that as the vehicle was leaving, it struck another car. She did not know which direction the truck went.

In the third recording, a man called at 1:16 a.m. to report "a possible abduction from Cassell Ridge Apartments." The call lasted 22 seconds and the man ended the call when he realized that another caller had already reached 911.

The fourth call was placed at 1:18 a.m. The male caller reported that he had chased a white '92 to '96 Ford Ranger on foot as it left the apartments. He said that he had attempted to help the girl and that he was

---

[1] The apartment complex is also referred to as Castle Ridge Apartments throughout the record.

almost run over by the truck. The caller told the dispatcher that the suspect prevented the victim from escaping each time she tried to flee. He reported that at one point, "[the victim] was trying to get out into the parking lot when we pulled in and he actually slammed her in . . . slammed her and the door of the vehicle into a parked vehicle . . ." In the recording, the caller was panting as though he was out of breath. The dispatcher advised the caller that several people had called 911 and that officers would arrive at the scene shortly.

Dawn Clark, a resident of Cassell Ridge Apartments at the time of the incident, testified that the [petitioner] was the father of the victim's child. She said that at around 1:00 a.m. on July 13, 2010, she was talking with the victim and three other women in front of her apartment building. The [petitioner] then arrived in a white truck and the victim immediately "took off running up the steps" and entered an apartment. When she returned and walked up to the [petitioner], he grabbed her by the hair, threw her on the ground, and began to beat her. Ms. Clark also saw the [petitioner] drag the victim on the sidewalk and kick her while she was on the ground. She stated that everyone was yelling and that as the [petitioner] hit the victim, he said, "You got these b***hes in my business. Ms. Clark then observed the following:

> And he snatched her up and threw her in the car, and she tried to get out of the car once. He—he threw her in the car, and he walked around to the other side, and she tried to get out of the car. He got out and went back around the car and hit her a few more times, closed the door. He didn't get to get all the way back around to the other side of the car before she opened the door again, and he went around and hit her again—he hit her again. And after he hit her he—again, he kind of mushed her down and climbed over—climbed in the car on—on the passenger side.

Ms. Clark testified that she tried to write down the truck's license plate number but that she had to jump out of the way when the [petitioner] accelerated the vehicle in reverse. She then chased after the truck on foot. As the [petitioner] drove off, the victim opened the passenger door again, and the [petitioner] "swerved and hit a parked car to get the door to close." After the passenger door closed, the [petitioner] drove straight and sped out of the parking lot. Ms. Clark stated that another car pulled into the lot as the [petitioner] drove off, and the man got out of his car and ran after the

truck with her. However, once they got to the top of a hill, they lost sight of the truck and did not know the direction in which it drove.

Ms. Clark said that she and the man walked back to the apartment complex, and after the police arrived, the victim returned in a different truck. She did not see who was driving the truck, which left after dropping off the victim. Ms. Clark stated that the victim was upset and crying, her face was bloody, her side and arm were "all scratched up," and her shirt was torn. Ms. Clark said that an ambulance arrived at the scene, though the victim did not want to go to the hospital. Two photographs of the victim and her injuries were admitted into evidence without objection.

On cross-examination, Ms. Clark testified that the victim was using her cell phone while they were outside, but she did not know with whom the victim was speaking. She said that neither the victim nor the [petitioner] said anything when the victim walked up to him. According to Ms. Clark, the victim did not say anything or make a sound until she was thrown into the truck. Ms. Clark acknowledged that she did not know what the victim was thinking that night.

Joseph K. Collins testified that at the time of the incident, he lived in Texas and that he was visiting his mother and sister at Cassell Ridge Apartments. They returned to the apartment complex around 1:00 a.m. on July 13, 2010, when Mr. Collins noticed a commotion outside of one of the buildings. He said that there was an argument near a white truck and that the truck's headlights were off. He continued to watch the scene and observed the following:

> A little more screaming, yelling. The door slams. He starts to take off. That's when I started to realize something was going on, because the truck abruptly stopped again. The door—the passenger door came back open. I saw what I assumed to be a female out of the side of the vehicle, and then abruptly she went back in the side of the vehicle. The door slams. They're probably about a building and a half away from me now.
>
> The door comes back open. It abruptly goes to the right. I thought that it had hit a vehicle which slammed the door shut again.

- 4 -

Mr. Collins could hear the victim scream and cry as the truck approached him. He stood in front of the vehicle and waved a flashlight, but it did not stop or slow down, so he had to jump out of the way. Mr. Collins then called 911 as the truck drove past him. He ran after the truck, but could not keep up, and he lost sight of the vehicle after it left the property. He testified that as the truck was about to exit the apartment complex, the door opened again and the victim was almost out of the vehicle, but someone slammed the brakes and "physically pulled her back in[.]" At that point, Mr. Collins could hear the victim scream, "Let me go." He knew that something was wrong when the victim was trying to get out of the truck. Mr. Collins recalled that in total, the passenger door opened "about five times" as the vehicle was moving. The only lights he ever saw on the truck were its brake lights. Mr. Collins was at the scene when the victim later returned in a dark SUV. He testified that the victim was missing a shoe and that her feet were "scuffed up . . . like a road rash."

On cross-examination, Mr. Collins stated that he did not see anyone run around the truck to shut the passenger door. He said that he reached the top of the second hill, past the first large speed bump, before he lost sight of the vehicle. He conceded that he did not know the [petitioner] or the victim or what was in their minds at the time.

Lieutenant Steven Patrick testified as the keeper of the records for jail phone calls at the Knox County Sheriff's Office. Over defense objection, two redacted recordings of jail phone calls were played for the jury. In the first call from September 2, 2010, the [petitioner] told the person on the line that if he called the victim, then she would not be home to be subpoenaed. In the second call from November 10, 2010, the [petitioner] opined that if the victim did not testify at trial, then there would be no case against him.

### Defense's Proof

The [petitioner] elected not [to] testify at trial. Rondriea Barnett, the named victim in the indictment, testified that she was twenty-one years old and that she met the [petitioner] when she was eighteen. She said that they had dated for about a year and had a child together but that they were no longer in a relationship. The victim stated that she was not kidnapped by the [petitioner] on July 13, 2010. She describes the incident as follows:

Me and [the petitioner] had got into it over the phone. He had came out there. We was arguing. Then he was, like, "Come on because people in our business." We had left. We had went to his mama house. We had a fight. After that, I got tired of hearing about it, so I left, and somebody dropped me off at home.

The victim acknowledged that the [petitioner] pulled her hair and hit her but denied that he kicked her or forced her to the ground. She said that she had hit the [petitioner] first and that she wanted to leave with him in his truck. She denied that the [petitioner] dragged her or threw her in the truck.

The victim explained that she had a scar on her forehead because she hit her face with the truck door that night. She stated that she injured her shoulder when she "tripped and fell" while getting into the vehicle. The victim said she had opened the passenger door "[b]ecause it wouldn't close all the way" and denied that she had tried to escape from the truck. She stated that this was "the only time" the door was opened that night. She did not recall that the [petitioner] hit another car while driving. She denied ever saying, "Let me go."

When the victim returned to Cassell Ridge Apartments, she was surprised to see the police there. She told the police that she did not want to seek an order of protection or file any charges against the [petitioner]. She also said that she did not want an ambulance and that she just wanted to go home. She then spent the night with the [petitioner]. The victim denied that the [petitioner] or his family had attempted to prevent her from testifying. She said that she was not afraid of the [petitioner] and that they had a good relationship despite their arguments. She stated that this incident was "most likely" the only time that their arguments had been physical.

On cross-examination, the victim acknowledged that the [petitioner] hit her in May 2009, but she denied that he had hit her in the face with a closed fist. She agreed that after she returned to the apartments on July 13, 2010, she told an officer, "He had drove off, put me in the car, and had drove off and had bit me on my face." She conceded that she told the officer, "I had to jump out."

Based on the above proof, the jury convicted the [petitioner] as charged of two counts of aggravated kidnapping. The trial court

subsequently merged the two alternative counts and sentenced the [petitioner] as a Range II, multiple offender to nineteen years' imprisonment, to be served at 100 percent. After the denial of his motion for new trial, the [petitioner] timely filed a notice of appeal.

*State v. Gregory Duff*, No. E2013-01582-CCA-R3-CD, 2014 WL 6612578, *1-4 (Tenn. Crim. App. Nov. 24, 2014), *perm. app. denied* (Tenn. Apr. 10, 2015).

After the denial of his direct appeal, the petitioner filed a timely petition for post-conviction relief. In the petition, the petitioner raised numerous claims of ineffective assistance, including trial counsel failed to question potential witnesses, failed to object to the "[trial judge] presiding over his trial and sentencing," failed to object to improper comments by the State in closing arguments, failed to object to improper comments by the State regarding the victim's lack of family support at the trial, failed to object to the State's comment that "voluntariness was not a defense to aggravated kidnapping," failed to call Ms. Dixon as a witness, and appellate counsel failed to have meaningful communication with the petitioner regarding his appeal. The post-conviction court held an evidentiary hearing during which trial counsel, Teresa Dixon,[2] the petitioner, and Wilhelmenia Yarbrough testified.

Trial counsel testified he was the third attorney to represent the petitioner in this matter and was appointed after the petitioner's previous counsel filed a motion to be removed. Although trial counsel met with the petitioner several times, the petitioner refused to answer any questions about the facts of the case and would not tell trial counsel where to find the victim so she could be interviewed. On cross-examination, trial counsel stated he did not have a cordial relationship with the petitioner and every visit ended "in a shouting match," which hindered trial counsel's ability to obtain information. As an example of their contentious relationship, trial counsel noted that the petitioner once attempted to prevent him from leaving the interview room. According to trial counsel, "[the petitioner] got in the way and wouldn't – wouldn't – he was in the – waiting in the door and would not let me out. This lasted a few seconds."

Trial counsel was able to locate the victim with the help of an investigator and met with her to obtain a statement. The victim told trial counsel she was neither kidnapped nor a victim. Despite his efforts, however, trial counsel was unable to locate any witnesses to corroborate the victim's statements. Trial counsel's defense strategy was to argue that the victim consented to going with the petitioner. Therefore, his main concern was "find[ing] out what [the victim] would say" on the witness stand. When asked about the possibility of additional witnesses, trial counsel testified he never heard the name

---

[2] Ms. Dixon is also referred to as Theresa Dixon throughout the record.

Wilhelmenia Yarbrough and only vaguely remembered Teresa Dixon was the petitioner's mother.

According to trial counsel, neither the petitioner nor Ms. Dixon volunteered any information about prior dealings with the trial judge. Therefore, he did not investigate whether the trial judge interacted with the petitioner during his time at the district attorney's office. While trial counsel knew the trial judge often informed defendants in his courtroom that he had recently left the district attorney's office, trial counsel did not know whether the trial judge had done so in this case because that communication would have occurred prior to trial counsel's appointment. On cross-examination, trial counsel stated he did not consider requesting the trial judge's recusal because he "did not know what the basis of such an objection would be." According to trial counsel, he did not have any reason to believe the trial judge could not be fair and impartial during the petitioner's trial.

After the State commented during its closing argument that consent was not a defense to aggravated kidnapping, trial counsel testified he "look[ed] that up, and [ ] found that that was the case, that voluntariness [was] not a defense." Despite his understanding of the law, trial counsel argued the victim was not kidnapped because she consented to going with the petitioner. In addition, trial counsel acknowledged the prosecutor's statement that he wanted to "rush up there and hold" the victim was "on the edge, but it was argument." Therefore, trial counsel made the decision not to object and draw more attention to the remark. According to trial counsel, the prosecutor's statement during rebuttal regarding the victim's lack of family support in the courtroom was proper and did not require an objection.

The petitioner's mother, Teresa Dixon, testified she was present for the petitioner's juvenile proceedings. Although she was not sure if the trial judge was the lead prosecutor during those proceedings, she remembered "seeing him at the table before." According to Ms. Dixon, she told trial counsel about the trial judge's possible involvement in the petitioner's juvenile proceedings, but he "wasn't worried about that."

Ms. Dixon also spoke with trial counsel regarding her knowledge of the victim's continued contact with the petitioner after the incident and leading up to the petitioner's arrest. Ms. Dixon testified she had not seen any further arguments between the petitioner and the victim after the night of the incident. While she believed she would testify at the petitioner's trial, trial counsel informed her, "he had been doing this a long time, and he already knew how he was going to present the case."

During cross-examination, Ms. Dixon acknowledged, although the petitioner and victim came to her house immediately after the kidnapping, she did not see the victim's

injuries because she was inside the house. She only heard the petitioner and victim arguing in front of the car. However, by the time she came outside, the petitioner had driven away and the victim had walked to a neighbor's house, where she received a ride home. Ms. Dixon told the petitioner's previous counsel the neighbor's name but could not verify she shared that information with trial counsel.

The petitioner testified the trial judge was someone he had seen at Knox County Juvenile Court, stating, "I don't remember what charge it was, but I remember seeing him in the courtroom on the other side." He told trial counsel his concerns and "[trial counsel] said he'd check into it, but he never did." The petitioner also stated he was never asked whether he consented to the trial judge presiding over his trial. If given the opportunity, he would have asked to go to another courtroom. The petitioner asked trial counsel for a copy of his juvenile record to investigate whether the trial judge was involved in his juvenile proceedings. However, "[trial counsel] always had an excuse why he couldn't get them." On cross-examination, the petitioner testified the trial judge may have been biased toward him. He pointed to the trial judge's ruling in favor of admitting the jail conversations as an example of bias. However, the petitioner did not reply when asked if it was possible the trial judge was simply applying the law.

The petitioner testified he told trial counsel about his mother's neighbor, Ms. Yarbrough, giving the victim a ride home. However, he did not know Ms. Yarbrough's real name and called her "Aunt Boot." He also admitted on cross-examination that the victim did not know "Aunt Boot's" name and, therefore, would not have been able to tell trial counsel.

The petitioner testified he never met or spoke with appellate counsel and only received paperwork through the mail from appellate counsel's law firm. The petitioner attempted to call appellate counsel several times but could not get an answer at the office or a return call. According to the petitioner, appellate counsel never discussed potential appellate issues with the petitioner. In addition, the petitioner was not aware appellate counsel was under review by the Board of Professional Responsibility.

Wilhelmenia Yarbrough testified she lived next door to Ms. Dixon on the night of the kidnapping. That evening, the victim approached her house and asked for a ride home. During the ride home, the victim was crying but did not show Ms. Yarbrough any bite marks or other injuries and did not complain of being hit or kidnapped. Ms. Yarbrough admitted during cross-examination that she did not see the petitioner and victim arguing at Ms. Dixon's house. Her husband, however, witnessed the fight and agreed to take the victim home. She confirmed she did not observe any injuries on the victim because "[the victim] was in the backseat, I was in the front seat. I did not turn around and observe anything." She also did not recall seeing blood on the victim's shirt

because she "didn't pay that much attention to her shirt, her clothes." The victim did not speak to Ms. Yarbrough on the way home except to give directions to her mother's house.

Ms. Yarbrough also testified she saw the victim and petitioner together at least once or twice after the incident. In addition, Ms. Yarbrough stated the petitioner would know her as "Ms. Peaches" or "Aunt Boot." Ms. Yarbrough stated she was not contacted by an attorney for the petitioner at any point during the trial.

After its review of the evidence presented, the post-conviction court denied the petition. This timely appeal followed.

**Analysis**

On appeal, the petitioner argues: trial counsel was ineffective for failing to seek recusal of the trial judge; trial counsel was ineffective for failing to object to inappropriate comments by the prosecutors during closing arguments; trial counsel was ineffective for failing to object to arguments made by the prosecutor concerning the effect of the victim's consent; trial counsel was ineffective for failing to call Teresa Dixon and Wilhelmenia Yarbrough as witnesses at trial; and appellate counsel was ineffective for failing to communicate with the petitioner. The petitioner also makes free-standing due process claims regarding the recusal of the trial judge and the inappropriate comments by the prosecutors. The State contends the post-conviction court properly denied the post-conviction petition because the petitioner failed to meet his burden. The State also contends the petitioner has waived all free-standing due process claims. Following our review of the record and submissions of the parties, we agree with the State and affirm the judgment of the post-conviction court.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the

petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.      Recusal of Trial Judge

First, the petitioner asserts trial counsel was ineffective for failing to seek recusal of the trial judge. According to the petitioner, trial counsel "failed to investigate and present evidence of the judge's close prior involvement with [the petitioner] at a motion to recuse." The State argues the petitioner failed to meet his burden.

The petitioner and his mother both testified they recognized the trial judge as a prosecutor from juvenile court. However, neither could state which of the petitioner's juvenile matters the trial judge worked on or how extensive his involvement was in those matters. Because the petitioner "remember[ed] seeing [the trial judge] in the courtroom on the other side" at juvenile court, he believed the trial judge "could have been bias[ed]" because "he ruled against me and let [the jail phone calls] in." The petitioner did not respond, however, when asked if the trial judge simply applied the law when admitting the phone calls. Ms. Dixon testified seeing the trial judge "at the table" during the petitioner's juvenile proceedings. A review of the petitioner's extensive juvenile record shows the trial judge was listed as being present during one detention hearing and listed as receiving a motion to suppress. The petitioner also contends the trial judge relied on these juvenile proceedings in enhancing the petitioner's sentence. Trial counsel testified neither the petitioner nor Ms. Dixon offered any information regarding the trial judge's previous dealings with the petitioner in juvenile court. He explained he did not file a motion to recuse because he "did not know what the basis of such an objection would be. I didn't know about anything."

The petitioner has presented no evidence to demonstrate the trial judge's alleged bias or prejudice. The petitioner's assertion that the trial judge's bias is evident through adverse rulings is without merit. *See Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. Apr. 20, 1994) ("Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification."). Also, the petitioner makes no specific allegations of impartiality other than the trial judge was a prosecutor in juvenile court at the time the petitioner had delinquency matters pending there. Furthermore, the post-conviction court stated he did not "recall the petitioner from his time in [j]uvenile [c]ourt nor do the records reflect that the trial judge played an active role in the petitioner's juvenile proceedings." Recusal is not required where the trial judge was a prosecutor in a previously concluded trial of the defendant and where the prior conviction is not in dispute. *State v. Warner*, 649 S.W.2d 580, 581 (Tenn. 1983) (noting constitutional disqualification is "limited by its very language to the *cause on trial* and does not include prior concluded trials") (emphasis in original); *State v. Conway*, 77 S.W.3d 213, 225 (Tenn. Crim. App. May 8, 2001) (holding the trial judge was not required to recuse himself when he was a prosecutor in the defendant's prior conviction and that conviction was used to enhance the defendant's current conviction); *Moultrie v. State*, 584 S.W.2d 217, 219 (Tenn. Crim. App. Nov. 22, 1978) (where "the

trial judge had at some point in the past been an assistant attorney general who had issued a subpoena in an unrelated trial of petitioner" recusal is not required).

Moreover, the petitioner's reliance on *Smith v. State*, 357 S.W.3d 322 (Tenn. 2011), is misguided. In *Smith*, the judge, while an assistant district attorney, corresponded with and provided information to the prosecutor handling the petitioner's murder charge. The petitioner was later sentenced to death on that charge at a resentencing hearing presided over by the then judge. Unlike the judge in *Smith*, the trial judge here was not involved in the petitioner's current case in any way prior to presiding over the trial. His prior involvement with the petitioner in juvenile court was not proven to be substantial and occurred over six years prior to presiding over the petitioner's current case.

Upon review, the post-conviction court stated the petitioner offered "no proof the trial judge's impartiality might reasonably be questioned in this case." We agree. The petitioner failed to show trial counsel's failure to file a motion to recuse amounted to deficient performance. Tenn. Code Ann. § 40-30-110(f); *Strickland*, 466 U.S. at 687. Thus, the petitioner is not entitled to relief.

The petitioner also contends, as a free-standing claim, the trial judge's refusal to recuse himself was a violation of the petitioner's due process rights. However, as noted by the State, the petitioner waived this challenge, as he failed to address this issue at trial, in his motion for a new trial, or on direct appeal. "It is well established that a party may not raise an issue in a post-conviction petition that could have been raised on direct appeal." *State v. Townes*, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000), *overruled on other grounds by State v. Terry*, 118 S.W.3d 355 (Tenn. 2003). In addition, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). Upon our review of the record, it is clear the petitioner failed to raise his present claim at any of the appropriate times including, at trial, in his motion for new trial, or on direct appeal. As such, the petitioner's present issue is waived, and he is not entitled to relief.

## II.    The State's Closing Arguments

Second, the petitioner argues trial counsel was ineffective for failing to object to improper statements by the prosecutors during closing arguments. In response, the State contends trial counsel made a tactical decision not to object. Moreover, the State argues no prejudice resulted from trial counsel's lack of an objection.

"Closing arguments serve to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Hawkins*. 519 S.W.3d 1, 47 (Tenn. 2017) (citations and quotations omitted). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008)). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id.* at 47-48 (quoting *Banks*, 271 S.W.3d at 131). Accordingly, a "prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (citations omitted).

There are five generally recognized areas of prosecutorial misconduct that can occur during closing arguments:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on evidence, by injecting issues broader than guilt or innocence of the accused under the controlling law.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (internal citations omitted).

**A.      Statements Regarding the Prosecutor as a Father**

- 14 -

The petitioner asserts trial counsel was ineffective for failing to object to statements made by the prosecutor during closing arguments regarding the prosecutor's feelings as a father toward the victim. Specifically, the prosecutor stated:

> As a father, I just—on the one hand, I wanted to rush up there and hold her and say, "Everything's going to be all right. Let's get through this," and on the other hand, I just wanted to shake her, and say, "What were you thinking?"

The State contends the failure to object to the statement was a tactical decision by trial counsel. Upon our review, we affirm the decision of the post-conviction court.

The petitioner argues these comments were "calculated to inflame the passions and prejudices of the jury, attempted to divert the jury to broader issues, and discussed facts outside the record." Trial counsel testified he thought the statement was "on the edge, but it was argument." Although he would not have made the statement himself, trial counsel stated he does not generally object during arguments because it "point[s] out what's being said again."

The post-conviction court concluded this statement was impermissible, and it would have sustained an objection, if made. However, the post-conviction court also found the statement did not prejudice the petitioner because "[t]his case is quite unique in that the victim was a witness for the defense." The prosecutor's sympathy toward the victim was, in actuality, sympathy toward "the key defense witness who directly testified that the alleged crime did not occur." The post-conviction court found trial counsel made a "conscious and informed decision not to draw more attention to the argument by objecting" and if the jury was moved to sympathy, it "would have likely been to the petitioner's benefit." We agree. Trial counsel made a strategic decision not to object, and the petitioner was not prejudiced by any sympathy garnered from the prosecutor's statement. *See Strickland*, 466 U.S. at 687; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The petitioner is not entitled to relief.

**B.     Statements Regarding the Victim's Lack of Support**

The petitioner also contends trial counsel was ineffective for failing to object to the prosecutor's statement during rebuttal regarding the victim's lack of support at the trial. The State argues trial counsel made a tactical decision not to object, and the petitioner was not prejudiced by this decision. We agree.

During rebuttal, the prosecutor stated:

- 15 -

Clearly, she doesn't have that support structure. Her mama wasn't in court. Her grandmama wasn't in court. Remember, we asked her that question. She said, "Why would they be here? They ain't got no reason to be here." She doesn't get it. It's for support.

The petitioner contends these statements were designed to inflame the passions of the jury and divert the jury "to broader issues rather than the question of [the petitioner's] guilt" by arguing facts not in the record. Trial counsel stated he thought this was proper argument because the prosecutor, during cross-examination, had asked the victim whether her mother and grandmother were in court with her. Therefore, he did not believe it was appropriate to object. The post-conviction court found this argument was not improper because the prosecutor made an argument "based on a line of questioning of the victim during the trial to try and explain why the victim would testify that she went with the petitioner voluntarily." Because the argument was proper, the post-conviction court found trial counsel was not deficient in failing to object.

Upon reviewing the record, we agree the statements were properly based on testimony given at trial and, therefore, trial counsel was not deficient in choosing not to object. *See Banks*, 271 S.W.3d at 131. The petitioner is not entitled to relief on this issue.

## C.    Statements Regarding Consent as a Defense to Aggravated Kidnapping

During closing arguments, the prosecutor stated, "[T]here's not anything in [the jury instructions] that talk[s] about consent to a kidnapping. It's just not part of the law." Later, in rebuttal, the prosecutor added, "It's not a defense to say she consented." The petitioner argues trial counsel was ineffective for failing to object to statements by the prosecutor regarding defenses to kidnapping. The State contends trial counsel made a strategic decision not to object.

The petitioner argues these statements were a mischaracterization of the law and trial counsel's failure to object to them was prejudicial. Trial counsel testified he researched the issue and discovered "that was the case, that voluntariness is not a defense." However, he tried to put on a defense that if the victim went voluntarily then the jury should find the petitioner not guilty. The post-conviction court found the prosecutor's comments to be a matter of semantics. Although no objection was made, trial counsel "argue[d] extensively that the crime of kidnapping had not been committed because the victim went with the petitioner willingly." Moreover, the post-conviction court found the jury understood both the jury instructions and trial counsel's argument.

- 16 -

Therefore, the post-conviction court found trial counsel was not deficient in failing to object to the statement.

Upon our review of the record, it is clear trial counsel developed his entire defense around the argument that the victim went willingly with the petitioner that night. Therefore, trial counsel made a tactical decision not to object to the prosecutor's statement in order to avoid drawing more attention to it. Nothing suggests trial counsel was ineffective in choosing not to object to this statement. *See Hellard*, 629 S.W.2d at 9. The petitioner is not entitled to relief on this issue.

The petitioner also makes free-standing due process claims regarding each of the above statements. As previously discussed, these claims are waived because the petitioner should have raised them at trial and/or on direct appeal. Tenn. Code Ann. § 40-30-106(g); *Townes*, 56 S.W.3d at 35.

### III.    Failure to Call Teresa Dixon and Wilhelmenia Yarbrough as Witnesses

The petitioner argues trial counsel was ineffective for failing to call Teresa Dixon and Wilhelmenia Yarbrough as witnesses during trial. According to the petitioner, these witnesses would have "added to the defense narrative of the events of that evening, serving to bolster the 'victim' witness that the State actively sought to discredit." The State contends the petitioner failed to meet his burden.

At the evidentiary hearing, Ms. Dixon testified the petitioner brought the victim to her house on the night of the kidnapping, and she heard them arguing in front of the car. However, they had already left the premises when she got dressed and went outside. She was not able to determine whether the victim had any injuries because she "didn't see her up close." Ms. Yarbrough testified she and her husband gave the victim a ride home after the kidnapping. The victim was crying but did not indicate she had been kidnapped. Ms. Yarbrough did not see any injuries on the victim because the victim "was in the backseat, I was in the front seat. I did not turn around and observe anything." She "didn't pay much attention to [the victim's] shirt, her clothes" so she was not able to testify as to whether the victim's shirt had blood on it. Trial counsel testified he never heard of Ms. Yarbrough and did not receive her contact information from the victim, the petitioner, or Ms. Dixon. He also stated he vaguely remembered that Ms. Dixon was the petitioner's mother. Trial counsel said he attempted to locate witnesses to corroborate the victim's story but "there was no – anyone to corroborate her story."

In finding the petitioner failed to establish trial counsel was deficient in locating and interviewing witnesses, the post-conviction court noted trial counsel interviewed "all witnesses presented . . . by the State and the petitioner." However, trial counsel was

"hampered by the petitioner's uncooperative attitude" which "extended to the petitioner's parents." Moreover, the post-conviction court found Ms. Dixon's testimony did not contradict that of the State's witnesses and "[b]ased on her limited knowledge," trial counsel was not deficient in failing to call her as a witness.

The petitioner contends these witnesses could have testified at trial regarding "the injuries that [the victim] sustained during her alleged kidnapping" and would have bolstered the credibility of the victim. However, neither Ms. Dixon nor Ms. Yarbrough was present at the time of the kidnapping. Ms. Dixon only saw the victim through the window that night and was not close enough to notice any injuries. While Ms. Yarbrough provided the victim with a ride home, she never turned around to observe the victim's condition and was, therefore, unable to testify as to whether the victim sustained any injuries or had blood on her shirt. Each woman testified the petitioner and victim continued to have a relationship after the kidnapping and up until the petitioner was arrested. However, evidence of an on-going relationship following the kidnapping was introduced by trial counsel through the victim's testimony that she was with the petitioner later on the night of the kidnapping and for several days after.

Upon our review of the record, we agree with the post-conviction court that the petitioner failed to prove trial counsel was deficient in failing to call either Ms. Dixon or Ms. Yarbrough as witnesses during the trial or that he was prejudiced in any way by trial counsel's decision. The petitioner is not entitled to relief.

## IV. Failure to Communicate by Appellate Counsel

Finally, the petitioner contends appellate counsel was ineffective for failing to meet or meaningfully communicate with the petitioner. The petitioner argues appellate counsel never met with him, responded to his phone calls, discussed potential issues, or informed him of appellate counsel's pending disciplinary proceedings. Due to a lack of communication, the petitioner contends appellate counsel failed to include several issues on appeal that would have likely resulted in reversal. The State contends the petitioner failed to meet his burden.

The petitioner testified he was not informed appellate counsel was having difficulty with the Board of Professional Responsibility. Appellate counsel never spoke to the petitioner about which issues to raise on appeal. The petitioner stated he only received written communication from appellate counsel and never spoke to him personally. He tried to call appellate counsel's office but did not receive a response or a return call. Unfortunately, appellate counsel died prior to the evidentiary hearing. The post-conviction court noted it had little information to go on due to appellate counsel's death and inability to testify. Assuming appellate counsel was ineffective for only

- 18 -

sending written communication to the petitioner, the post-conviction court found the petitioner "failed to show that he suffered prejudice from the deficiency" because "no proof was presented to support his claim."

On appeal, the petitioner suggests he was prejudiced by appellate counsel's failure to raise several issues on appeal. According to the petitioner, the following issues would have been raised had appellate counsel engaged in meaningful communication with him: the recusal of the trial judge, the petitioner's sentence, and the trial court's denial of trial counsel's motion to be relieved as counsel.

The test used to determine whether appellate counsel was constitutionally effective is the same test applied to claims of ineffective assistance of counsel at the trial level. *Carpenter*, 126 S.W.3d at 886. To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Carpenter*, 126 S.W.3d at 887. The petitioner satisfies the prejudice prong of the *Strickland* test by showing there is a reasonable probability, or "a probability sufficient to undermine the confidence in the outcome," that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887; *citing King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Carpenter*, 126 S.W.3d at 887. Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to

raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

As previously discussed, the petitioner's claim that recusal of the trial judge was warranted is without merit. Recusal is not required simply because the trial judge was a prosecutor in the petitioner's prior juvenile proceedings. *Warner*, 649 S.W.2d at 581. In addition, the petitioner presented no evidence to demonstrate the trial judge's alleged bias or prejudice.

In regards to the petitioner's two remaining issues, the petitioner's sentence and the denial of trial counsel's motion to be relieved as counsel, the petitioner asserts raising these issues on appeal "would have led to a reversal and remand of [the petitioner]'s case." The petitioner offers no argument, nor does he cite any authority in support of this position. It is the petitioner's burden to prove that the issues which were not raised on appeal had merit and, if raised, there is a reasonable probability the petitioner's conviction would have been reversed. Because the petitioner failed to carry this burden, these issues are without merit.

The petitioner has failed to show he suffered any prejudice from appellate counsel's lack of face-to-face or oral communication and, therefore, he cannot succeed in his ineffective assistance claim. *Strickland*, 466 U.S. at 687. The petitioner is not entitled to relief.

## Conclusion

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE

- 20 -